# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JANE ROE,**

      **Plaintiff,**

        v.

**JAVAUNE ADAMS-GASTON, et al.,**

      **Defendants.**

**Case No. 2:17-cv-945**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

Plaintiff Jane Roe[1] was a student at The Ohio State University (OSU) until she was suspended and later expelled for alleged sexual misconduct. In her Motion for Preliminary Injunction (ECF No. 2), Roe argues that she was denied her constitutional right to procedural due process because she was unable to cross-examine adverse witnesses during the university disciplinary hearings. For the following reasons, Roe's Motion for Preliminary Injunction is **GRANTED**, and the Court enjoins Defendants from disciplining Roe based on the results of OSU's disciplinary hearings.

## I.

OSU disciplined Roe for two separate incidents of alleged sexual misconduct. Roe was suspended as a result of the first incident and expelled as a result of the second.

### A.    September 3, 2016 Incident

On September 3, 2016, Roe attended a showing of the Rocky Horror Picture Show. (*See* Hr'g Packet at PageID 453–54, 465, ECF No. 29.) Roe met several acquaintances at the show, including complainant LH. (*See id.*) Roe and LH had each consumed significant amounts of

---

[1] The Court uses an alias to protect Roe's identity. (*See* Nov. 2, 2017 Op. & Order at 1–2, ECF No. 13.)

alcohol. (*See id.*) While seated next to LH, Roe purportedly touched LH inappropriately. (*See id.* at PageID 454.) Alleging that Roe "engaged in intentional sexual touching with [LH] without consent and/or by force or coercion," OSU charged Roe with several violations of the Code of Student Conduct. (*Id.* at PageID 439.)

OSU typically adjudicates charges of student sexual misconduct by first investigating the allegations and then holding a disciplinary hearing. (*See* Code of Student Conduct at PageID 61–62, ECF No. 1; Sexual Misconduct Policy at PageID 50, ECF No. 1.) Although OSU encourages the complainant and the accused to attend the disciplinary hearing, neither party is required to attend. (Code of Student Conduct at PageID 64–65.) And although the parties can invite witnesses to attend the hearing, the parties cannot compel witnesses' attendance or testimony. (*See id.*) A student found responsible for sexual misconduct may appeal the decision to the university's executive vice president for student life or that official's designee. (*See id.* at PageID 68–69.)

Defendant Deirdre Rosenfeld, Associate Director for Student Life and Deputy Title IX Coordinator at OSU, investigated the September 3 incident. Rosenfeld interviewed Roe, the complainant (LH), and five other witnesses—VO, AB, TH, LS, and BW. (*See* Hr'g Packet at PageID 438.) The meeting notes from these interviews, along with other written records relating to the incident, constituted the administrative hearing packet for the disciplinary case. (*See id.*)

On April 19, 2017, OSU held a disciplinary hearing. (Hr'g Tr. at PageID 151, ECF No. 28.) Defendant Meghan Ninneman presided as the administrative hearing officer. (*Id.*) LH, Roe, and three other witnesses—VO, TH, and AW—testified. (*Id.* at PageID 153.)

Complainant LH testified to being intoxicated at the show. (*See* Hr'g Tr. at PageID 202–04.) The day after the show, LH spoke with VO, and possibly AB, who told LH about Roe's

2

actions. (*Id.* at PageID 197.) In the course of this conversation, LH personally remembered Roe's actions. (*Id.* at PageID 197–98.) When asked to clarify those memories, LH stated: "All of my thoughts about that are in the [administrative hearing] packet. I already have them clarified." (*Id.* at PageID 198.) The hearing packet contains the notes from the investigator's interview with LH. (Hr'g Packet at PageID 452.) The notes indicate that LH remembered "being felt up by [Roe] while floating in and out of consciousness" at the theater. (*Id.* at PageID 454.)

Roe testified that she did not remember kissing or touching LH. (Hr'g Tr. at PageID 208, 215.) Roe acknowledged that she sat next to LH at some point during the show, but she testified that she simply continued watching the show and did not interact with LH. (*Id.* at PageID 214, 218.)

VO testified that LH "was not 100 percent sober or conscious" and seemed to be slouching over in the theater seat. (Hr'g Tr. at PageID 174.) VO did not recall if he had seen Roe physically touch or kiss LH. (*Id.* at PageID 176.) Rather, he recalled that Roe's "body language was encroaching on [LH's] space" and that the encroachment was not invited. (*Id.*)

TH testified that Roe sat next to LH at some point during the show but that he was "not sure what interaction [LH and Roe] had from there." (Hr'g Tr. at PageID 163.)

AW testified that she spoke with LH sometime in September 2016 after the incident. (Hr'g Tr. at PageID 189.) LH informed AW that Roe had "felt [LH] up" during the show while LH was passed out. (*See id.*) AW testified that LH learned of Roe's actions from VO. (*See id.*)

AB, LS, and BW did not testify at the hearing. But as noted above, their statements to the investigator were included in the administrative hearing packet in the form of interview meeting notes.

AB told the investigator that LH was drunk at the show; LH's eyes were closed, and

3

LH's head was resting against the seat. (Hr'g Packet at PageID 458.) While LH was in this condition, Roe was leaning over and kissing LH's face, AB stated. (*Id.*)

LS also told the investigator that LH was drunk at the show. (Hr'g Packet at PageID 470.) LS stated that LH was slouched in the theater seat and that LH's eyes were closing. (*Id.*) LH was in this condition when Roe kissed LH and ran her hands up and down LH's body, LS indicated. (*Id.*)

After considering the witness testimony provided during the April 19 hearing and the information contained in the administrative hearing packet, the administrative hearing officer found Roe in violation of OSU's Code of Student Conduct. (*See* May 3, 2017 Ltr. at PageID 721, 723, 725, ECF No. 29-2.) According to the hearing officer, "the statements made by [Roe] during both the hearing and the office of Student Conduct's investigation were not plausible or credible in light of the weight of the other factors and evidence considered." (*Id.* at PageID 725.) The statements of the complainant and other witnesses, by contrast, "presented a consistent and credible account of this incident and together outweighed the contradictory information presented by the respondent." (*Id.*)

As punishment for her purported violations of the Code of Student Conduct, Roe was suspended from OSU for two years. (*See* May 3, 2017 Ltr. at PageID 722.) On appeal, OSU upheld the hearing officer's decision and Roe's suspension. (*See* June 9, 2017 Ltr. at PageID 623, ECF No. 29-1.)

**B.      November 12, 2016 Incident**

The second incident occurred on November 12, 2016, when Roe met complainants RK and MH at a bar for drinks and dancing. (Hr'g Packet at PageID 479–82, 484–85, ECF No. 29.)[2]

---

[2] Some documents in the record refer to RK as AK. RK changed names during the disciplinary investigation. (Hr'g Packet at PageID 564, ECF No. 29.)

4

Roe, RK, and MH eventually took an Uber back to Roe's house. (*Id.* at PageID 480, 483, 485.)
There, the three engaged in sexual activity. (*Id.* at PageID 480, 483, 485–87.) RK and MH
contend that it was nonconsensual. (*Id.* at PageID 481, 483.) Alleging that Roe "engaged in
intentional sexual touching and sexual penetration with [RK and MH] without consent and/or by
force or coercion," OSU charged Roe with several violations of the Code of Student Conduct.
(*Id.* at PageID 492–93.)

Defendant Rosenfeld investigated the incident. She interviewed Roe, the complainants
(RK and MH), and seven other witnesses—VO, BS, SH, AR, JE, LS, and JL. (*See* Hr'g Packet at
PageID 476–77.) The meeting notes from these interviews, along with other written records
relating to the incident, formed the administrative hearing packet for the disciplinary case. (*See
id.*)

OSU held a disciplinary hearing on June 21, 2017. (Hr'g Tr. at PageID 236, ECF No. 28.)
Defendant Allan Williams was the administrative hearing officer. (*Id.*) Rosenfeld, Roe, and four
other witnesses—VO, AR, JE, and JL—testified. (*Id.* at PageID 238.) The complainants did not
attend or testify at the hearing. (*See id.* at PageID 238, 256–59.)

In her testimony, Rosenfeld responded to Roe's suggested revisions to the investigative
summary that Rosenfeld had prepared as part of the administrative hearing packet. (*See* Hr'g Tr.
at PageID 247–56.) The summary briefly describes the allegations against Roe, presents bullet
point summaries of the witness interviews, and indicates that any documents related to the case
are included in the hearing packet. (*See* Hr'g Packet at PageID 479–91.)

In her statements to the investigator before the hearing, Roe indicated that she and the
complainants went to her room after taking the Uber from the bar. (Hr'g Packet at PageID 530.)
They almost immediately moved to the bed, where the complainants purportedly began taking

5

off Roe's clothing. (*Id.*) Roe and the complainants then engaged in consensual sexual acts, Roe explained. (*See id.* at PageID 530–32.) At the hearing, Roe reiterated that neither of the complainants was substantially impaired on the night in question and that Roe obtained consent from them for every sexual act she performed. (Hr'g Tr. at PageID 323.)

VO testified that he spoke with witness AR several days after the incident. (*See* Hr'g Tr. at PageID 303.) AR told VO about a conversation she had with Roe in which Roe stated that she and complainant RK had sex. (*See id.*)

AR testified that she spoke to complainant RK sometime after the incident. (*See* Hr'g Tr. at PageID 314.) RK seemed very upset about the incident. (*Id.*) But according to AR, RK did not remember anything from that night. (*See id.* at PageID 316–17, 319.) AR also testified that RK's alcohol tolerance is relatively high. (*Id.* at PageID 318.)

JE testified that she spoke to complainant RK several times after the incident. (*See* Hr'g Tr. at PageID 288.) According to JE, RK consistently stated that a sexual encounter with Roe "was not something that [RK] wanted or [RK was] able to consent [to], and that [the encounter] was always something that was like unwanted and uncomfortable for [RK]." (*Id.* at PageID 288–89.)

JL was Roe's roommate. (Hr'g Tr. at PageID 271.) He testified that on the night of the incident he was sitting at the kitchen table in their apartment and saw Roe come downstairs with someone. (*See id.* at PageID 275–76.) Roe and the person were talking as they walked to the door. (*Id.* at PageID 276.) JL did not hear the person slur words or see the person stumble while walking. (*See id.*) And according to JL, the person seemed to be aware of her surroundings and did not exhibit any signs of intoxication. (*See id.* at PageID 276–77.)

Although the complainants did not testify at the hearing, they sent statements directly to the hearing officer and requested that the statements be read aloud during the hearing. (*See* Prelim. Inj. Hr'g Ex. 4, at Bates No. OSU-Roe_000830, OSU-Roe_000833.) The hearing officer received MH's statement on June 19; he received RK's statement the morning of the hearing (June 21). (*Id.*) Because Roe objected to the statements being read at the hearing, the hearing officer did not read the statements. (*See* Hr'g Tr. at PageID 319–21.) The statements were, however, included in the administrative hearing packet. (*Id.* at PageID 321.) In their statements, the complainants described the impacts of Roe's alleged assault and their reasons for bringing the disciplinary action. (*See* Prelim. Inj. Hr'g Ex. 4, at Bates No. OSU-Roe_000830 to OSU-Roe_000834.)

The complainants also made pre-hearing statements to the investigator; those statements were included in the administrative hearing packet. (*See* Hr'g Packet at PageID 476–77; Hr'g Tr. at PageID 238, 256–59.) Complainant RK told the investigator that RK agreed to intercourse with Roe but that RK was too drunk to consent. (*See* Hr'g Packet at PageID 512.) Complainant MH informed the investigator that MH was severely intoxicated and was forced to give Roe oral sex. (*See id.* at PageID 519, 550, 576.)

BS, SH, and LS did not testify at the hearing either. Nonetheless, their statements to the investigator were also included in the administrative hearing packet. (*See* Hr'g Packet at PageID 476–77.)

BS was complainant MH's roommate and partner. (Hr'g Packet at PageID 537.) She told the investigator that she picked up MH the night of the incident. (*Id.*) MH was extremely intoxicated and needed assistance getting into BS's car. (*See id.* at PageID 537–38.)

SH told the investigator about a conversation she had with Roe sometime after the incident in which Roe purportedly stated that she and the complainants had gotten really drunk and had sex. (*See* Hr'g Packet at PageID 561.) SH also informed the investigator about conversations she had with the complainants after the incident in which the complainants stated that the sexual encounter between them and Roe was not consensual. (*See id.* at PageID 562.)

LS informed the investigator about a meeting between LS, VO, LH, and the complainants in which complainant MH accused Roe of being a rapist. (*See* Hr'g Packet at PageID 592.)

After considering the testimony presented during the June 21 hearing and the information contained in the administrative hearing packet, the administrative hearing officer found Roe in violation of the Code of Student Conduct. (*See* July 21, 2017 Ltr. at PageID 611–12, 614–15, ECF No. 29-1.) The hearing officer "found that the statements made by [Roe] during both the hearing and the Office of Student Conduct's investigation were not plausible or credible in light of the weight of the other factors and evidence considered." (*Id.* at PageID 614.) The complainants, by contrast, gave "credible and plausible" statements establishing that the complainants were substantially impaired (and thus unable to consent to sex), that Roe should have recognized the complainants' substantial impairment, and that Roe did not obtain "the complainants' clear, knowing, and expressed consent before and during each sexual act." (*See id.* at PageID 614–15.)

OSU permanently dismissed (i.e., expelled) Roe for her purported violations of the Code of Student Conduct. (July 21, 2017 Ltr. at PageID 612.) OSU upheld the hearing officer's decision and Roe's expulsion on appeal. (*See* Oct. 2, 2017 Ltr. at PageID 706, ECF No. 29-1.)

**C.     Procedural History**

Roe brought this case on October 26, 2017. (Compl. at 1, ECF No. 1.) She has since filed

an Amended Complaint. (Am. Compl. at 1, ECF No. 39.) Roe is suing various university officials involved in OSU's disciplinary process: Javaune Adams-Gaston, the Vice President for Student Life at OSU; Kellie Brennan, the Title IX Coordinator at OSU; Diedre Rosenfeld, an Associate Director for Student Life and Deputy Title IX Coordinator at OSU; Meghan Ninneman, a Sexual Misconduct Investigator at OSU; Allan Williams, a Sexual Misconduct Investigator at OSU; and Doug Koyle, an Assistant Vice President for the Office of Student Life at OSU. (*Id.* at 1–4.) Adams-Gaston is sued in her official capacity. (*Id.* at 2.) The other Defendants are sued in their official and individual capacities. (*Id.* at 2–4.)

Roe asserts two claims: (1) a claim seeking a declaratory judgment that Defendants violated her right to due process under the Ohio and United States constitutions and (2) a claim under 42 U.S.C. § 1983 for Defendants' alleged violation of her right to due process under the United States Constitution. (Am. Compl. at 40–43.) In her Amended Complaint, Roe identifies several features of OSU's disciplinary process that allegedly violated her due process rights. (*See id.* at 41–42.) For purposes of the present Motion for Preliminary Injunction though, Roe has limited the scope of her claims to one alleged procedural deficiency of the disciplinary process—Roe's inability to effectively cross-examine adverse witnesses. (*See* Stipulation at 1, ECF No. 36.) Based on this alleged deficiency, Roe requests that the Court enjoin OSU from disciplining her. (*See* Mot. at 1, 11, 20, ECF No. 2.)

On February 12, 2018, the Court held a hearing on the Motion for Preliminary Injunction. Roe and Defendant Rosenfeld testified. Roe discussed the harm she has suffered from OSU's disciplinary decisions. Rosenfeld described her investigative process and the methods she uses to assess the credibility and plausibility of a student's story. Following the witnesses' testimony, counsel for Roe and the Defendants argued their positions to the Court.

9

Roe's Motion is now ripe for review.

## II.

When evaluating a request for a preliminary injunction, the Court considers (1) whether the movant has demonstrated a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury without the injunction, (3) whether the injunction would cause substantial harm to others, and (4) whether issuing the injunction would serve the public interest. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (quoting *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 963 F.2d 855, 859 (6th Cir. 1992)). The factors "simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.* (quoting *Am. Imaging Servs.*, 963 F.2d at 859). The party seeking the preliminary injunction bears the burden of justifying the requested relief. *Id.*

## A.    Likelihood of Success on the Merits

Roe argues that she has a strong likelihood of success on the merits of her § 1983 procedural due process claim. The Court agrees.

### 1.    Cross-Examination of Adverse Witnesses

Roe brings her procedural due process claim under 42 U.S.C. § 1983, which provides a remedy for "the deprivation of rights, privileges, or immunities secured by the Constitution and laws" with respect to actions taken by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must prove (1) that she was deprived of a right secured by the Constitution or laws of

the United States and (2) that the deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

"The Constitution requires certain minimum procedures before an individual is deprived of a 'liberty' or 'property' interest within the meaning of the Due Process Clause of the Fourteenth Amendment." *Doe v. Cummins*, 662 F. App'x 437, 445 (6th Cir. 2016). These interests are implicated when a student faces suspension or expulsion from a public university for sexual misconduct. *See Univ. of Cincinnati*, 872 F.3d at 399 ("Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest.'" (quoting *Cummins*, 662 F. App'x at 445)). Consequently, before issuing significant disciplinary decisions, a public university must afford its students minimum due process protections. *See id.*

To determine the amount of process required under the Constitution, courts balance three factors: (1) the nature of the private interest affected by the deprivation; (2) the risk of an erroneous deprivation in the current procedures used, and the probable value, if any, of additional or alternative procedures; and (3) the governmental interest involved, including the burden that additional procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Through its consideration of these factors, the Sixth Circuit has held that a student facing suspension or expulsion is entitled, at a minimum, to notice of the charges, an explanation of the evidence against her, and an opportunity to present her side of the story before an unbiased decision maker. *Univ. of Cincinnati*, 872 F.3d at 399–400. The particular amount of process constitutionally required in a particular case varies, however, based on the application of the *Mathews* factors to the circumstances of the case. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634–35 (6th Cir. 2005).

11

The student's opportunity to share her side of the story must occur at some type of hearing. *Univ. of Cincinnati*, 872 F.3d at 400. The hearing, however, need not involve the formalities of a criminal trial, as a university's first priority is education, and "[f]ormalizing hearing requirements would divert both resources and attention from the educational process." *Id.* (quoting *Jaksa v. Regents of the Univ. of Mich.*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984)). "Review under *Mathews* asks only whether [the accused student] 'had an opportunity to "respond, explain, and defend,'" not whether a jury could constitutionally convict him using the same procedures." *Id.* (quoting *Cummins*, 662 F. App'x at 446).

Plaintiff has identified in her Amended Complaint several features of the disciplinary proceedings that purportedly violated her constitutional due process rights. Plaintiff requests a preliminary injunction, however, based solely on the argument that she was not allowed the opportunity to effectively cross-examine adverse witnesses. (*See* Stipulation at 1, ECF No. 36.)

The right to cross-examine adverse witnesses is a fundamental feature of our legal system. The right, which finds expression in the Sixth Amendment to the United States Constitution, stems from the principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)). An individual's ability to test the government's evidence is important with respect to documentary evidence, but "it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* (quoting *Greene*, 360 U.S. at 496). "In almost every setting where important decisions turn on

questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.* at 269; *see also Greene*, 360 U.S. at 497 (stating that the Supreme Court has zealously protected the right to cross-examination "not only in criminal cases . . . but also in all types of cases where administrative and regulatory actions were under scrutiny"). *But cf. Richardson v. Perales*, 402 U.S. 389, 404–05 (1971) (rejecting a claimant's assertion that his inability to cross-examine reporting physicians at a Social Security hearing was a due process violation given that the claimant "did not take advantage of the opportunity afforded him . . . to request subpoenas for the physicians").

In the Sixth Circuit, the right to cross-examine adverse witnesses applies to certain university disciplinary proceedings. *Univ. of Cincinnati*, 872 F.3d at 401 ("Accused students must have the right to cross-examine witnesses 'in the most serious of cases.'" (quoting *Flaim*, 418 F.3d at 636)). When a university misconduct case hinges on credibility, cross-examination is "not only beneficial, but essential to due process." *Id.* at 402 (quoting *Flaim*, 418 F.3d at 641). As the Sixth Circuit has explained:

> Cross-examination takes aim at credibility like no other procedural device. A cross-examiner may "delve into the witness' story to test the witness' perceptions and memory." He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." His strategy may also backfire, provoking the kind of confident response that makes the witness appear more believable to the fact finder than he intended. Whatever the outcome, "the greatest legal engine ever invented for the discovery of truth" will do what it is meant to: "permit[] the [fact finder] that is to decide the [litigant]'s fate to observe the demeanor of the witness in making his statement, thus aiding the [fact finder] in assessing his credibility."

*Id.* at 401–02 (citations omitted); *see also Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018) ("[I]f the credibility of an alleged victim is at issue, the university must provide a way for the

adjudicative body to evaluate the victim's credibility and 'to assess the demeanor of both the accused and his accuser.'" (quoting *Univ. of Cincinnati*, 872 F.3d at 406)).

The Sixth Circuit's recent decision in *Doe v. University of Cincinnati* is both instructive and binding on this Court. The case stemmed from the University of Cincinnati's (UC) decision to suspend a student, John Doe, for sexual assault. *Univ. of Cincinnati*, 872 F.3d at 396. Doe and the complainant, Jane Roe (no relation to the Plaintiff here), had sex at Doe's apartment. *Id.* Doe and the complainant disagreed, however, on whether the sex was consensual. *Id.*

UC addressed the misconduct allegations through an Administrative Review Committee (ARC) hearing process. *Univ. of Cincinnati*, 872 F.3d at 396. UC's Title IX Office investigated the misconduct allegations by gathering evidence and interviewing Doe and the complainant. *See id.* at 396–97. UC then held a hearing at which a panel of faculty and students listened to the allegations against Doe, reviewed the evidence (including the information gathered by the Title IX Office), and questioned the participating witnesses. *See id.* Doe was able to question the witnesses who appeared at the hearing through a circumscribed form of cross-examination whereby he submitted written questions to the panelists and the panelists then determined whether to pose the questions to the witnesses. *Id.* UC encouraged witnesses to attend the hearing, but it did not require them to attend. *Id.* at 397. And in Doe's matter, the complainant did not attend the hearing. *Id.*

Despite the complainant's absence, the ARC Chair read into the record a summary of the Title IX Office's investigation report, which began with the complainant's account of the night in question. *Univ. of Cincinnati*, 872 F.3d at 397. Because the complainant was not present, Doe was unable to cross-examine her. *See id.* at 397–98. The Chair also read a summary of the

witness statements given by four of the complainant's friends who heard about the alleged sexual assault from the complainant. *Id.* at 397.

Upon the ARC's recommendation, UC suspended Doe. *Univ. of Cincinnati*, 872 F.3d at 398. Doe then sued in this Court, which granted a preliminary injunction enjoining UC from suspending him. *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio 2016).

The Sixth Circuit affirmed the district court's decision. *Univ. of Cincinnati*, 872 F.3d at 407. The Sixth Circuit was not concerned with the manner in which UC required Doe to cross-examine witnesses (i.e., Doe directing questions to witnesses through the ARC panelists). *See id.* at 405–06. Nor was it concerned with Doe's inability to physically confront the complainant at the hearing. *See id.* at 406. Rather, the Sixth Circuit took issue with the ARC panel resolving, without the benefit of any form of cross-examination, a disciplinary case that hinged on credibility. *See id.* at 400–04. The panel was faced with "competing claims" and "the lack of corroborative evidence to support or refute [the complainant's] allegations." *Id.* at 402. These circumstances left the panel with "a choice between believing an accuser and an accused." *Id.* (quoting *Flaim*, 418 F.3d at 641). The panel, however, "resolved this 'problem of credibility' without assessing [the complainant's] credibility," and, in fact, the panel resolved the credibility dispute "without seeing or hearing from [the complainant] at all." *Id.* (quoting *Flaim*, 418 F.3d at 641). This, the Sixth Circuit stated, was a denial of due process. *Id.*

*University of Cincinnati* shares important similarities with this case. In both cases, the university conducted an investigation that elicited statements from adverse witnesses, including the complainant(s). In both cases, adverse witnesses did not attend the disciplinary hearing, nor could the accused compel the attendance of the complainant(s) through subpoenas. And in both cases, despite the adverse witnesses' absence from the hearing, and despite the accused student's

15

inability to cross-examine these individuals, the fact finder considered the adverse witnesses' statements in rendering a disciplinary decision.

Given those circumstances, the Sixth Circuit found a denial of due process in *University of Cincinnati*. Defendants, however, argue that *University of Cincinnati* does not control the outcome in this case.

### a. September 3, 2016 Incident

Defendants contend that the adverse witnesses absent from the hearing on the September 3 incident gave statements to the investigator that were duplicative of the in-person hearing testimony provided by the complainant. (Mem. in Opp'n at 8, ECF No. 31.) And because the complainant attended the hearing and was subject to cross-examination, due process did not require that Roe have an opportunity to cross-examine the absentee adverse witnesses. (*See id.* at 8–9.)

The Court disagrees that the absentee adverse witnesses (AB and LS) offered statements that were duplicative of the complainant's in-person testimony. AB informed the investigator that Roe was leaning over and kissing the complainant's face. (Hr'g Packet at PageID 458, ECF No. 29.) And LS told the investigator that Roe kissed LH and ran her hands up and down the complainant's body. (*Id.* at PageID 470.) The complainant, by contrast, simply testified: "I firmly stand by everything I said in the packet." (Hr'g Tr. at PageID 193, ECF No. 28.) And when pressed on specific memories of September 3, the complainant testified: "All of my thoughts about that are in the [administrative hearing] packet." (*Id.* at PageID 198.) The complainant's statements in the hearing packet (i.e., her statements to the investigator) roughly mirror AB's and LS's statements to the investigator. (*See* Hr'g Packet at PageID 454, 458, 470.)

16

AB's and LS's statements are not, however, duplicative of the complainant's in-person testimony. (*Compare id.* at 458, 470, *with* Hr'g Tr. at PageID 193–206.)

The Court need not parse these statements further though. The decision in *University of Cincinnati* did not hinge on whether an absentee witness's statement was duplicative of testimony from a witness present at the hearing. The Sixth Circuit found that Doe had been denied due process because the hearing panel, "without seeing or hearing from [the accuser]," decided a case requiring it to choose "between believing an accuser and an accused." *Univ. of Cincinnati*, 872 F.3d at 402 (quoting *Flaim*, 418 F.3d at 641).

Here, although more than one witness contends that Roe inappropriately touched the complainant, the disciplinary case still boiled down to a choice between believing accusers and believing the accused. As the administrative hearing officer acknowledged in her decision, she chose between competing stories—and ultimately found the story told by the accusers to be more credible. (*See* May 3, 2017 Ltr. at PageID 725, ECF No. 29-2.) Because the hearing officer chose between believing Roe and believing her accusers without seeing or hearing from the only two witnesses, aside from the complainant, who claimed to have personally observed the inappropriate touching, Defendants likely violated Doe's procedural due process rights. *See Univ. of Cincinnati*, 872 F.3d at 402.

### b.      November 12, 2016 Incident

Defendants argue that Roe had no right to cross-examine the complainants in the second disciplinary matter because the hearing officer's decision in that matter was not based solely on the statements the complainants made to the investigator outside of the hearing. (Mem. in Opp'n at 9, ECF No. 31.) Roe's own testimony, and the testimony of witnesses who attended the hearing, also supported the hearing officer's decision, Defendants aver. (*Id.*) Specifically,

17

Defendants contend that (i) Roe admitted to engaging in sexual interactions with the complainants, (ii) Roe "claimed she did not consent to the sexual activity yet she bragged to her roommate about having a three-way sexual encounter," (iii) Roe "admitted having trouble setting boundaries when she drinks," (iv) Roe "could not describe how she received consent" from the complainants, and (v) the complainants' statements corroborate each other, so the case was not a "he said/she said" situation. (*Id.* at 10.) Defendants' arguments lack merit.

The decision concerning the November 12 incident, like UC's decision in *University of Cincinnati*, involved a choice between competing stories that the hearing officer resolved by evaluating credibility. As he explained in the decision, the hearing officer weighed the evidence supporting Roe's version of the incident against the evidence supporting the complainants' version. (*See* July 21, 2017 Ltr. at PageID 615, ECF No. 29-1.) The complainants' version outweighed Roe's because, according to the hearing officer, only the complainants' version of the incident was credible. (*See id.* at PageID 614–15.) As in *University of Cincinnati* though, the hearing officer made this choice between competing stories without seeing or hearing from the complainants—the only individuals aside from Roe who were present when the alleged sexual misconduct occurred. Given these facts, due process likely required that Roe have an opportunity to cross-examine the complainants. *See Univ. of Cincinnati*, 872 F.3d at 402.

Roe did not lose her right to cross-examine the complainants by simply admitting that she engaged in sexual conduct with the complainants. Defendants attempt to analogize the disciplinary decision on the November 12 incident to *Flaim v. Medical College of Ohio*, a case in which the Sixth Circuit concluded that the accused student did not have a right to cross-examine an adverse witness because the student had admitted to the misconduct that prompted the college to expel him—the student's felony conviction. *See* 418 F.3d at 632–33, 641; *Univ. of Cincinnati*,

872 F.3d at 401. But here, unlike in *Flaim*, Roe has not admitted a fact that, standing alone, would allow the university to discipline her. In her statements to the investigator and in her testimony at the hearing, Roe insisted that the complainants were not too intoxicated to consent and that she obtained the complainants' consent for every sexual act she performed. (Hr'g Tr. at PageID 323, ECF No. 28.) Defendants have not identified any provision of the OSU Code of Student Conduct that prohibits what Roe admitted—consensual sex between individuals who were not substantially impaired.

That Roe bragged about having a three-way but later claimed that she did not consent to some of the complainants' actions does not forfeit Roe's right to cross-examine the complainants either. In his decision, the hearing officer mentioned Roe's purported inconsistent statements. (*See* July 21, 2017 Ltr. at PageID 614, ECF No. 29-1.) But Roe's statements were simply one factor that the hearing officer considered when weighing the credibility of Roe's and the complainants' competing stories. (*See id.* at PageID 614–15.) The present disciplinary matter still involves, like the disciplinary matter in *University of Cincinnati*, a choice between competing stories. Roe's purported inconsistent statements do not transform this disciplinary matter into one involving an admitted, dispositive fact, as in *Flaim*.

Roe's admission that she had trouble setting boundaries when she drank, similar to her purported inconsistent statements, was one of several factors that the hearing officer considered when weighing credibility. (*See* July 21, 2017 Ltr. at PageID 614–15.) And like Roe's purported inconsistent statements, Roe's admission to having trouble setting boundaries was not dispositive of whether Roe violated the Code of Student Conduct. The disciplinary matter still hinged on whether Roe's story was more credible than the complainants'.

Defendants' assertion that Roe could not describe how she received consent from the complainants is inaccurate. Roe began her testimony with a statement on consent: "I'm going to start, neither of [the complainants was] ever substantially impaired that night. They could consent for each and every act, and I did get consent for each and every act I did. They were willing participants in sound mind and body." (Hr'g Tr. at PageID 323.) Roe followed this statement with detailed testimony on how, throughout the night in question, she obtained the complainants' consent for the sexual acts she performed. (*See id.* at PageID 323–48.) The hearing officer seemingly found this explanation responsive to the issue of consent, as he did not pose any follow-up questions on the issue. (*See id.* at PageID 351–64.) Instead, the hearing officer stated: "I do appreciate—you did a good job of telling me how you felt you had consent, which is usually a question that I would ask. So I appreciate you answering a lot of that already." (*Id.* at PageID 351.)

The assertion that complainants' statements to the investigator corroborate each other is not entirely accurate either. Complainant RK told the investigator that RK agreed to intercourse with Roe but that RK was too drunk to consent. (*See* Hr'g Packet at PageID 512, ECF No. 29.) Complainant MH agreed that the complainants were too drunk to consent to sex. (*See id.* at 519–20.) But MH denied that Roe asked to engage in intercourse and denied hearing RK agree to intercourse. (*Id.* at PageID 548.) And whereas MH stated that Roe forced MH to perform oral sex on her, RK stated that there was no penetration between Roe and MH. (*Id.* at PageID 512, 519.)

But even if the complainants' statements did corroborate each other, the disciplinary matter would still be one, like the disciplinary matter in *University of Cincinnati*, that required the fact finder to choose between two competing stories. To choose between those stories, the

20

hearing officer in this matter needed to, and did, make credibility determinations. (*See* July 21, 2017 Ltr. at PageID 614–15, ECF No. 29-1.) But the hearing officer made those credibility determinations without the benefit of observing Roe (or anyone else) cross-examine the complainants—the only individuals present, other than Roe, when the purported sexual misconduct occurred.

### c.    Arguments Raised at the Preliminary Injunction Hearing

During the preliminary injunction hearing, Defendants argued that cross-examination was not necessary for the hearing officers to make credibility determinations. The investigation preceding each disciplinary hearing was an iterative process, Defendants argued, in which the investigator shared her interview notes with the witnesses, who were then permitted to revisit their statements or respond to the statements made by other witnesses. The hearing officers could make credibility determinations by reviewing the hearing packets containing this documentation, Defendants suggested.

Recognizing that universities are not courts, the Sixth Circuit has permitted universities some flexibility in the cross-examination procedures they use in disciplinary proceedings. *See Univ. of Cincinnati*, 872 F.3d at 404–05. In *Cummins* and *University of Cincinnati*, for example, the Sixth Circuit approved a "circumscribed form of cross-examination" in which a fact-finding panel asked the witness questions on behalf of the accused student. *Univ. of Cincinnati*, 872 F.3d at 404–05; *Cummins*, 662 F. App'x at 448. The accused student had to submit written questions to the panel, which then decided whether to ask each question. *Univ. of Cincinnati*, 872 F.3d at 396–97; *Cummins*, 662 F. App'x at 448. The accused student was not allowed to submit follow-up questions. *Cummins*, 662 F. App'x at 448; *see Univ. of Cincinnati*, 872 F.3d at 404. And in *University of Cincinnati*, the Sixth Circuit explained that an accused student's right to cross-

examine adverse witnesses is not the right to physically confront those witnesses at the hearing. *See* 872 F.3d at 404–06; *cf. Maryland v. Craig*, 497 U.S. 836, 857 (1990) (concluding that a child victim may testify outside of a criminal defendant's physical presence where such a procedure is necessary to protect the child from trauma that would impair the child's ability to communicate).

This flexibility has limits though. Defendants have not pointed to a Sixth Circuit case—nor any case—in which a university's pre-hearing investigation was found to be a constitutionally adequate substitute for cross-examination. The dearth of case law supporting Defendants' position is likely because a pre-hearing investigation is not an adequate substitute for cross-examination. Cross-examination helps fact finders make credibility determinations because, among other things, it permits fact finders to observe witnesses' demeanor while testifying. *Univ. of Cincinnati*, 872 F.3d at 402. Here, however, the pre-hearing investigations were conducted by an investigator, not the hearing officers, so even if the investigator was able to assess the absentee adverse witnesses' demeanor, the hearing officers (i.e., the fact finders) did not have that opportunity. Cross-examination also helps fact finders make credibility determinations because it allows an accused student to test, in real time, a witness's testimony. *See id.* Here, Roe was unable to comment and receive any type of feedback on many of the statements made by the absentee adverse witnesses. Regarding the November 12, 2016 incident, there was no opportunity for comments and responses on the impact statements that the complainants submitted to the hearing officer the day before, and morning of, the hearing. Roe was able to comment on the complainants' earlier statements to the investigator. But, assuming the investigator conveyed all of Roe's comments to the complainants, the complainants were under no obligation to respond to Roe's comments—and they certainly were not obligated to

22

respond in real time. And as to the September 3, 2016 incident, there was no opportunity for comments and responses on any of the absentee adverse witnesses' statements: the investigator only interviewed those witnesses once.

Defendants suggested during the hearing that observing witness demeanor is a less effective method of assessing witness credibility than the methods purportedly used by OSU's investigator and hearing officers (i.e., determination of a story's inherent plausibility and identification of evidence corroborating the story). But, again, Defendants have not identified any court that has found a university's pre-hearing investigation to be a constitutionally adequate substitute for cross-examination. Defendants' argument also ignores the reality of how the Defendant hearing officers assessed the evidence presented to them. Rather than eschewing demeanor as an unreliable method of evaluating credibility, the hearing officers explicitly inquired during the hearings about the complainants' demeanor. (Hr'g Tr. at PageID 190 ("[W]hen [complainant LH] was disclosing this information, can you just provide some insight into her . . . demeanor."), 294 ("[W]as there a change in sort of demeanor from each conversation, or was the demeanor consistent along with the facts based?"), 307 ("Can you also talk about, was there a change in demeanor?"), 314 ("When [complainant RK] spoke to you about this incident for the first time, what was [RK's] demeanor?"), 316 ("And how was – was [complainant RK's] demeanor different at all?"), ECF No. 28.) Cross-examination, moreover, does more than allow a fact finder to observe a witness's demeanor: it allows the accused to test a witness's testimony for infirmities, such as forgetfulness, confusion, misperceptions, or evasion, and for possible biases, prejudices, or ulterior motives. *See Univ. of Cincinnati*, 872 F.3d at 402.

In any event, the principle that a fact finder can assess a witness's credibility, at least in part, by observing the witness's demeanor has deep roots in this country's legal system. *See, e.g.*, *Goldberg*, 397 U.S. at 269; *Univ. of Cincinnati*, 872 F.3d at 401–02. The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. And cross-examination, the United States Supreme Court has concluded, is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 Wigmore § 1367). Cross-examination is such a valuable truth-seeking tool, the Court explained, because it ensures that "the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Id.* at 157–58 (quoting *Mattox v. United States*, 156 U.S. 237, 242–43 (1895)). The principle that a fact finder can assess a witness's credibility by observing her demeanor is so ingrained in our legal system that the Federal Rules of Civil Procedure mandate a procedure by which a successor judge, when substituting into a proceeding in which the judge is the fact finder, can recall witnesses so he or she can personally observe their testimony. *See* Fed. R. Civ. P. 63 ("In a hearing or a nonjury trial, the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness."). Given the central role cross-examination has played as a truth-seeking device in our justice system, and given that Defendants have not identified any authority supporting their position, the Court cannot conclude that a pre-hearing investigative process, such as OSU's, is a constitutionally adequate substitute for cross-examination.

24

Defendants have also averred that the investigator's testimony during the second disciplinary hearing obviated any need Roe might have had to cross-examine the complainants in that matter because Roe had the opportunity to question the investigator about purported inconsistencies in the complainants' statements. The Sixth Circuit has, admittedly, given universities flexibility in the cross-examination procedures they use in disciplinary proceedings. *See Univ. of Cincinnati*, 872 F.3d at 404–05. But, again, this flexibility has limits. Nothing in *University of Cincinnati* or any of the Sixth Circuit's other cases addressing due process in the university discipline context indicates that an accused student's ability to cross-examine the investigator who spoke with a complainant is a constitutionally adequate substitute for the accused student's ability to cross-examine the complainant. Cross-examination is an effective fact-finding tool because, among other things, it allows a fact finder to observe a witness's demeanor. *See id.* at 402. The fact finder cannot observe the complainant's demeanor if an investigator is speaking for the complainant. Although an investigator might be able to answer questions about deficiencies in the complainant's testimony, the investigator would be able to adequately answer those questions only if she knew about the deficiencies. It does not require a stretch of the imagination to assume that a complainant might not reveal to the investigator all of the infirmities in her story or the potential biases, prejudices, or ulterior motives that could undermine her credibility.

Finally, citing *Gischel v. University of Cincinnati*, 1:17-cv-475, 2018 WL 705886, at *13 n.9 (S.D. Ohio Feb. 5, 2018), Defendants argued that this Court has interpreted *University of Cincinnati* to require cross-examination only if there is no evidence corroborating the complainant's allegations. In *Gischel*, a decision issued days before the preliminary injunction

hearing in this case, the Court summarized in a footnote the Sixth Circuit's holding in *University of Cincinnati*, stating:

> In *Doe v. University of Cincinnati*, the accuser did not appear at the disciplinary hearing and could not be cross-examined. *Id.* at 398, 402. The adjudicatory panel had to rely on her written statement because there was no corroborating evidence in the case and the panel had to make a credibility determination, absent a cross-examination, to determine whether the assault occurred. *Id.* The Sixth Circuit affirmed a preliminary injunction enjoining the accused student's suspension because the accused student was denied a meaningful opportunity to cross-examine his accuser. However, the Sixth Circuit stated that cross-examination "may be unnecessary where the University's case does not rely on testimonial evidence from the complainant." *Id.* at 405.

*Gischel*, 2018 WL 705886, at *13 n.9. Based on this language, Defendants suggest that an accused student has no right to cross-examine adverse witnesses if any evidence, irrespective of its strength or probity, corroborates the complainant's allegations. However, neither this footnote nor anything else in *Gischel* suggests that the Court has adopted the narrow interpretation proposed by Defendants. The Sixth Circuit's reference in *University of Cincinnati* to corroborating evidence was made in the context of the circuit's decision in *Flaim*, a case in which the accused student admitted to being convicted of a felony—an admission that, by itself, allowed the college to expel the student. *See Univ. of Cincinnati*, 872 F.3d at 401–02 (citing *Flaim* 418 F.3d at 641, 643, and *Plummer v. Univ. of Houston*, 860 F.3d 767, 775–76 (5th Cir. 2017), a case in which the Fifth Circuit concluded that cross-examination was not required because the plaintiffs had distributed videos and a photograph of the victim's assault online and the university's case did not rely on testimonial evidence from the victim). And here, as noted earlier, the evidence purportedly corroborating the complainants' accusations against Roe is unlike the corroborating evidence in *Flaim* because Roe has not admitted a fact that, standing alone, would allow the university to discipline her.

2.      **Viability of Roe's § 1983 Claim**

a.      **Connection to the Disciplinary Hearings**

Defendants argue that Roe cannot prevail on her § 1983 claim against Adams-Gaston,

Brennan, Rosenfeld, and Koyle because those individuals had no involvement in determining the

process provided to Roe during the disciplinary hearings. (*See* Mem. in Opp'n at 4–5, ECF No.

31.) This argument is not well taken.

Roe seeks a preliminary injunction based on her § 1983 claim against Defendants in their

official capacities. (*See* Reply at 4–5, ECF No. 34.) A state official may be sued in her official

capacity for prospective injunctive relief from an action that violates a federal statute or the

United States Constitution if the official has, by virtue of her office, some connection to, or any

responsibility for, the challenged conduct. *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634

(6th Cir. 2013); *Floyd v. Cty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012).

Defendants have stipulated "that one or more of the named Defendants are empowered to

provide injunctive relief that may be ordered by the Court." (*See* Stipulation at 2, ECF No. 36.)

Consequently, at least one of the Defendants has, by virtue of her office, some connection to, or

any responsibility for, the alleged constitutional violations.

Roe, however, need not rely only on the parties' stipulation: the evidence submitted by

Roe establishes Defendants' connection to, or responsibility for, the alleged constitutional

violations. Brennan, the Title IX Coordinator, oversees OSU's Title IX reports and

investigations. (Sexual Misconduct Policy at PageID 51, ECF No. 1.) Rosenfeld, a Deputy Title

IX Coordinator, oversees Title IX reports and investigations as well. (*Id.*) She also supervises

Defendants Ninneman and Williams, the administrative hearing officers who presided over

Roe's disciplinary hearings. (*See id.* at PageID 51–52.) As to Adams-Gaston and Koyle, the Vice

President for Student Life and an Assistant Vice President for the Office of Student Life,

respectively, OSU's Code of Student Conduct provides that "final responsibility and authority

for the discipline of all students" has been delegated by the president "to the vice president for

student life, whose office is also charged with responsibility for promulgation of rules governing

student conduct." (Code of Student Conduct at PageID 71, ECF No. 1.) Koyle, moreover,

decided Roe's appeal in both disciplinary matters. (*See* June 9, 2017 Ltr. at PageID 623, ECF

No. 29-1; Oct. 2, 2017 Ltr. at PageID 706, ECF No. 29-1.)

> **b.** **Immunity**

Defendants next contend that Eleventh Amendment immunity bars Roe's § 1983 claim

against Ninneman and Williams (the administrative hearing officers) in their official capacities

and that qualified immunity bars Roe's claim against them in their individual capacities. (*See*

Mem. in Opp'n at 5–6, 11–13, ECF No. 31.) Neither of these arguments undermines Roe's

strong likelihood of success on the merits.

As noted above, Roe requests a preliminary injunction based on her § 1983 claim against

Defendants in their official capacities. (*See* Reply at 4–5, ECF No. 34.) So even if qualified

immunity bars the individual capacity portion of Roe's claim against Ninneman and Williams,

Roe can still show a strong likelihood of success on the merits of the official capacity portion of

her claim.

The Eleventh Amendment grants the states immunity from suit. *McCormick v. Miami

Univ.*, 693 F.3d 654, 661 (6th Cir. 2012). This immunity extends to suits against public

universities, such as OSU, and official capacity suits against public university employees. *Doe v.

Ohio State Univ.*, 219 F. Supp. 3d 645, 654 (S.D. Ohio 2016). The Eleventh Amendment has an

exception though. Under *Ex parte Young*, a federal court may enjoin a state officer, acting in her

official capacity, from prospectively violating a federal statute or the United States Constitution. *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 904 (6th Cir. 2014) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Defendants insist that the *Ex parte Young* exception does not apply because there is no continuing violation of federal law for the Court to enjoin. (*See* Mem. in Opp'n at 6.) Defendants argue, in other words, that Roe is unlikely to show that she had a constitutional right to cross-examine adverse witnesses during her disciplinary hearings, a position this Court has rejected. (*Id.*)

Roe seeks prospective relief to end a continuing violation of federal law: an injunction restoring her as a student and prohibiting further disciplinary proceedings that violate her constitutional rights. (Am. Compl. at 44, ECF No. 39.) And given the Court's conclusion that Defendants likely violated Roe's procedural due process rights by denying her the opportunity to cross-examine adverse witnesses, Roe can rely on the *Ex parte Young* exception in pursuing her § 1983 claim against Ninneman and Williams in their official capacities.

### c.    The Ohio Constitution and the Fifth Amendment

Defendants also aver that Roe cannot prevail on her § 1983 claim to the extent that she brings it under the Ohio Constitution or the Fifth Amendment to the United States Constitution. (*See* Mem. in Opp'n at 2–3, ECF No. 31.) This argument has merit, but it fails to undermine Roe's likelihood of success on the merits.

Roe bases her § 1983 claim on Defendants' alleged violation of the due process provisions of the United States Constitution. (Am. Compl. at 43, ECF No. 39.) Only her claim for declaratory judgment (not at issue in the present Motion) is rooted in the Ohio Constitution. (*See id.* at 36–39.) And although the Fifth Amendment's Due Process Clause does not apply to

state actors, such as Defendants, *Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000),

Roe brings her § 1983 claim under both the Fifth Amendment and the Fourteenth Amendment,

(Am. Compl. ¶ 115). Because the Fourteenth Amendment applies to state actors, *Scott*, 205 F.3d

at 873 n.8, Roe can show a strong likelihood of success on the merits of her claim even if the

Fifth Amendment basis for the claim is unfounded.

Roe, in sum, has demonstrated a strong likelihood of success on the merits of her § 1983

procedural due process claim.

**B.      Irreparable Injury**

The second factor in the preliminary injunction analysis requires the Court to consider

whether the movant would suffer irreparable injury without the injunction. *Univ. of Cincinnati*,

872 F.3d at 399. When, as here, "constitutional rights are threatened or impaired, irreparable

injury is presumed." *Id.* at 407 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.

2012)).

Defendants argue that Roe's injury is speculative because "[i]t is unclear at this time what

actual harm Roe has suffered as a result of her dismissal." (Mem. in Opp'n at 14, ECF No. 31.)

The Sixth Circuit rejected an identical argument in *University of Cincinnati*. The court noted

that, in the absence of an injunction, "Doe would be suspended for a year and suffer reputational

harm both on and off campus based on a finding rendered after an unfair hearing." *Univ. of

Cincinnati*, 872 F.3d at 407. Defendants have not distinguished their argument from the one

rejected by the Sixth Circuit. And, in any event, the Court concludes that Roe's injury is not

speculative. In the absence of an injunction, Roe would continue to be expelled and suffer

significant reputational harm based on the outcome of hearings in which she was denied the

opportunity to cross-examine adverse witnesses.

Defendants have not overcome the presumption of irreparable harm, and, consequently, this factor weighs in favor of issuing a preliminary injunction.

**C.      Substantial Harm to Others**

Under the third preliminary injunction factor, the Court considers whether the preliminary injunction would cause substantial harm to others. *Univ. of Cincinnati*, 872 F.3d at 399.

Defendants insist that this factor weighs in their favor because the issuance of a preliminary injunction would reinstate Roe at OSU and, thus, place her "in close proximity" with the complainants. (Mem. in Opp'n at 15, ECF No. 31.) In this particular case, Defendants' concern is unfounded. Roe has completed all of her coursework and simply seeks the conferral of her degree. (*See* Mot. at 2, ECF No. 2.) While this matter proceeds, OSU may prohibit Roe from entering the campus or having contact with the complainants.

Because the issuance of a preliminary injunction would not cause substantial harm to others, the third factor also weighs in favor of issuing an injunction.

**D.      Public Interest**

Under the final preliminary injunction factor, the Court considers whether issuing the injunction would serve the public interest. *Univ. of Cincinnati*, 872 F.3d at 399. Preventing the violation of an individual's constitutional rights always serves the public interest. *Id.* at 407. And here, a preliminary injunction would redress the likely violation of Roe's constitutional right of procedural due process.

Defendants assert that the public interest would not be served by issuing a preliminary injunction because issuing an injunction "in cases such as this one would substantially interfere with a university's disciplinary process to the point of permitting students to remain on campus

even though a neutral fact-finder determined the student engaged in non-consensual sex with another student." (Mem. in Opp'n at 16, ECF No. 31.) Defendants' argument disregards an important fact: the requested preliminary injunction would apply only to Roe, who has already completed all of her coursework and simply seeks the conferral of her degree. (*See* Mot. at 2, ECF No. 2.) Roe would not remain on campus, as Defendants fear, if the Court were to issue a preliminary injunction. Whether this factor would be different with another student otherwise still enrolled is not a matter before the Court in this case.

The final factor, like each of the other factors, weighs in favor of issuing an injunction, and the Court will therefore issue the preliminary injunction requested by Roe.

## E.      Security Bond

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the language of Rule 65(c) appears to be mandatory, the Sixth Circuit has stated that the district court has discretion over whether to require the posting of a bond. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

Roe proposes a nominal bond of $1, the same amount set by the district court in *University of Cincinnati*. (Mot. at 19–20, ECF No. 2.) Defendants have not proposed a bond amount. (Mem. in Opp'n at 16 n.7, ECF No. 31.) Instead, Defendants ask for an opportunity to address the bond requirement only if the Court decides to issue a preliminary injunction. (*Id.*)

The Court denies Defendants' request to submit additional briefing on the bond requirement. The Court concludes, based on a review of the record in this case, that the granting

of a preliminary injunction does not pose a risk of economic harm to Defendants. As such, the Court will set a nominal bond of $100.00.

### III.

For these reasons, Roe's Motion for Preliminary Injunction (ECF No. 2) is **GRANTED**, and the Court enjoins Defendants from disciplining Roe based on the results of OSU's April 19 and June 21, 2017 disciplinary hearings. The Court sets a nominal bond of $100.00.

To be clear, the Court's preliminary injunction does not prevent Defendants or OSU from prohibiting Roe from entering the campus and contacting the complainants or the other individuals involved in the disciplinary matters. Nor does the Court's preliminary injunction prohibit Defendants or OSU from holding new disciplinary hearings that satisfy the Constitution's due process requirements and then disciplining Roe if, based on the new hearings, she is found to have violated OSU's Code of Student Conduct.

**IT IS SO ORDERED.**

    4-17-2018
**DATE**                              EDMUND A. SARGUS, JR.
                                      **CHIEF UNITED STATES DISTRICT JUDGE**

33